FILED

MAR 2 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CASE NUMBER   1:06CV00531

JUDGE: Henry H. Kennedy

DECK TYPE: Employment Discrimination

DATE STAMP: 03/21/2006

JURY ACTION

JURY DEMAND

Jacqueline West,
    Plaintiff   13115 WaterFowl Way )
         Upper Marlboro, MD )
v.            20774 )
                          )
John Potter in his official capacity as )
Postmaster General of the )
United States Postal Service, )
    Defendant )

## **Complaint**

### **Introduction**

1.    Plaintiff, Jacqueline West hereinafter referred to as Mrs. West, began work for defendant in October 1996 as Acting Manager, Maintenance Operations Support.

2.    Plaintiff is an employee of defendant, and defendant is an employer within the meaning of Title VII of the Civil Rights Act.

3.    Plaintiff resides in Upper Marlboro, Maryland.

4.    Defendant John Potter serves and Postmaster General of the United States Postal Service. He is sued in his official capacity.

5.    Defendant issued a partial acceptance and partial dismissal letter of the formal EEO Complaint on August 23rd, 2005.   Plaintiff could not litigate the dismissed issues until the

conclusion of the investigation.    This complaint includes both the accepted and dismissed allegations.

6.    Defendant issued a report of investigation on November 9, 2005, and counsel for plaintiff received the investigation on November 14, 2005.    The cover letter associated with the investigation granted plaintiff a right to file a private right of action in federal court within 90 days of November 14.

7.    Unless enjoined, plaintiff will suffer irreparable harm including but not limited to risk of physical violence and intentional infliction of mental anguish.

8.    Defendant's regulations require the agency to attempt resolution via mediation. Although not required to do so, plaintiff requested mediation, but defendant refused to provide mediation or other alternative dispute resolution.

9.     This complaint is severable.   Should the court uphold the partial dismissal of the EEO complaint, plaintiff asks that the court view the dismissed allegations as background information. Allegations of prior conduct dismissed by the agency should not be stricken from the complaint, because they form the basis for establishing plaintiff previously engaged in protected activity. The facts demonstrate a pattern and practice of discrimination over a long period of time. Allegations from prior years can be adjudicated on the merits, because the allegations taken as a whole exhibit an on-going violation of rights based upon plaintiff's sex, age, disability, and prior EEO activity.

## Venue

10.     Venue is proper, because plaintiff works for defendant in Washington D.C., records related to her employment are in Washington D.C., and defendant's principal place of business is Washington D.C.

## Jurisdiction

11.     The court has subject matter jurisdiction under the Civil Rights Act and based upon the fact an officer of an instrumentality of the United States is a defendant.

## Exhaustion of Administrative Remedies

12.     Plaintiff properly exhausted all of her administrative remedies and proceeds after receiving the final agency decision on December 29, 2005.

## Statement of Facts

13. Plaintiff, Jacqueline West, by her undersigned counsel, hereby brings this action against Defendant, John Potter, Postmaster General of the United States Postal Service, asking compensatory damages to redress discrimination based on age in violation of 29 U.S.C. §§ 621 *et seq.*

14. This action arises under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.*, and the common law of the state of Virginia.

15. Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1343(4) and 29 U.S.C. §§ 216(b), 626(c)(1); and over state law claims pursuant to the doctrine of pendent jurisdiction.

16. Jacqueline West (hereinafter "Ms. West" or "plaintiff") is an individual who is, and at all times relevant herein was, a resident of Upper Marlboro, in the Commonwealth of Maryland.

17. Ms. West was hired as an employee for the U.S. Postal Service in New York City on or about December 13, 1981 and held various positions. In June 1993, she was promoted to Supervisor of Maintenance Operations at the Washington, DC plant. She continued to work as a Supervisor of Maintenance Operations until May 31, 2005. She was assigned to the agency's Cursee-Morris Processing and Distribution Center. Plaintiff's work site is located in the vicinity of Washington, D.C.

18. Plaintiff worked for defendant full-time. Plaintiff is a U.S. citizen. She therefore meets the legal definition of an employee. Title VII of the Civil Rights Act of 1964, makes it illegal to discriminate in employment on the basis of race, color, religion, sex, or national origin.

19. Defendant employs over 100 employees and therefore meets the legal definition of employer.

20. Defendant paid plaintiff a salary of $58,828 per year.

21. As Supervisor of Maintenance Operations, the Plaintiff's duties included, but were not limited to: (List duties in bulleted points)

- According to USPS Official Job Description for Supervisor, Maintenance Operations, dated October 1992 the functional purpose of this position is to supervise an assigned group of building and equipment maintenance, and custodial activities at a mail processing center/facility.

- Complainant handled the maintenance bidding system for about two(2) years, which had previously been performed by Steve Mummenday, Manager Maintenance Operations, level 23, where as she was paid at level 17.

- In approximately 2004, Ms. West was assigned travel for Maintenance, but told to train Anthony D'Souze, level 19, to take over the travel portion of training which began May 31, 2005.

- Posting bids

- Step 2 grievances - Louis Higginbotham, Manager of Maintenance was

5

responsible for the handling of Maintenance grievances at the second level of the

grievance procedure.   Supervisors were responsible for grievances at the first

level of the grievance procedure.   Effective March of 2000, Louis Higginbotham

delegated his authority over to me and I was assigned to handle all maintenance

grievances at the second level of the grievance procedure for maintenance. These

duties constituted a portion of the administrative reasonable accommodations.

- Attend arbitrations along with other supervisors and managers
- Handled attendance control for maintenance

22. Male employees were paid at levels 19 and 23 for the same work she was paid at level 17.

Steve Mummendey was paid at level 22 for the time he handled the maintenance bidding system.

He is currently being paid at level 23 now that he has taken over the maintenance bidding system

during Ms. West's absence.


23. Ms. West is an African-American, female who suffers from Post Traumatic Stress Disorder.

This disorder was brought on by continuous threats, harassment and retaliation by Leonard

Adams.  She provided medical evidence of her disorder to Miguel Ghersi for Leonard Adams,

Engineering Specialist Anthony D'Souza and Acting Manager of Maintenance, Damone

Williams.  Therefore, Mr. Adams was aware of Ms. West's disability.  Medical documentation

dated June 17, 2005 and July 13, 2005 from Kim B. Jones-Fearing, M.D. indicates that Ms. West

has been diagnosed with Post Traumatic Stress Disorder and concurrent mood disorder.  Ms.

West has received ongoing medical care for this impairment.

24. Ms. West had filed a prior EEO complaint against Mr. Adams on or about October 24, 1997 alleging discrimination, sexual harassment and retaliation. Leonard Adams was aware of Ms. West's prior activity and had made reference to it on several occasions. Mr. Adams has acted on his threat to "get that bitch" due to her prior EEO activity after another employee she supervised filed an EEO claim against Leonard Adams and won.

25. Prior to having her life threatened, Ms. West supervised mechanics and that after the EEO complaints, she was reassigned by Leonard Adams to supervise custodians and she was denied weekends off.

26. Ms. West did not formally speak to a management official regarding her claim of not being paid at a higher level because Mr. Adams specifically informed her not to talk to him about her job. A male supervisor was offered Ms. West's administrative duties and she was informed that this reasonable accommodation was being revoked from her.

27. Ms. West has experienced higher levels of stress contributing to Post Traumatic Stress Disorder (PTSD) requiring a higher dosage of her medications. Beginning June 2005, she began receiving almost weekly counseling for her impairment. Therefore, because of more frequent doctor visits and increased medication, she has been unable to work since May 31, 2005.

28. Plaintiff has rendered outstanding service and performed her duties in a commendable and highly efficient manner.

# Count 1 Harassment

29.    Plaintiff incorporates allegations in paragraphs 1-28 above by reference.

30.    Plaintiff, Jacqueline West, was harassed based on her sex (female), age (over 40), and disability (extreme stress and post-traumatic stress disorder) by Defendant, the United States Postal Service.

31. On May 18, 2005, Leonard Adams, Manager of Maintenance Operations, informed Plaintiff she was being moved to a position of supervisory capacity, where she would supervise approximately 37 employees. Such movement is in retaliation against Plaintiff. This action violated of her previous settlement agreement with management that provides, in part:

    i.    Plaintiff is to keep her current position, days off, and tour as previously promised. This includes the provision that Plaintiff is not to supervise any employees.

    ii.   Plaintiff's 1997 rating of "unacceptable" is to be changed to "acceptable", and the money Plaintiff would have gotten had she received an "acceptable" rating is to be given her pro-rata.

    iii.  Plaintiff is to retain her former parking arrangement revoked by Mr. Adams in 2003, which allowed her to park away from employee parking and near the gas pump or compound.

32. Not only is Plaintiff being required to supervise employees in violation of her previous settlement agreement with management, but Plaintiff is being made to supervise an unusually large amount of employees. The average number of employees under a supervisor is 15-20. Plaintiff is supervising approximately 37 employees.

33. The group of employees Plaintiff is being made to supervise potentially includes Michael Edwards, the employee who threatened her life. Although she was not assigned to supervise Mr. Edwards directly, she will in fact be in such a position when all other supervisors are absent.

34. The group of employees Plaintiff is being made to supervise is the least desirable group to supervise because of its reputation as an especially difficult group with which to work. Supervising this group significantly decreases her potential for promotion.

35. On May 18, 2005, Mr. Adams informed Plaintiff she would have to work Saturdays. This is a direct violation of her settlement accommodation prohibiting her from working on weekends. Management directed this to be the case because of the likelihood of Mr. Edwards' presence and the minimal level of security and other personnel in the building on such days. Mr. Adams disregarded management's directives in retaliation against Plaintiff. The group Plaintiff was assigned to begin supervising effective June 4, 2005 was previously supervised by Lisa Brown-McNeil. When Ms. Brown-McNeil was in this position, she was given Saturdays and Sundays off. Now that Plaintiff occupies this position, Mr. Adams suddenly feels weekend work is necessary for this position and cannot be given as time off.

36. On May 18, 2005, Mr. Adams informed Plaintiff she would have to vacate her office space, which was isolated from Michael Edwards, and move to an open-area supervisor's office. Mr. Edwards frequents this area as part of his daily activities because his supervisor is also located there.

37. On May 18, 2005, Mr. Adams changed the type of work Plaintiff is to perform. Although Plaintiff held the title of Supervisor Maintenance Operations (EAS 17), she was performing administrative work normally handled by employees of higher pay levels. She was not receiving the requisite pay for such work. The duties Plaintiff performed prior to her new assignment are being transferred to higher level employees. Steve Mummendey (EAS 23) will be responsible for the Maintenance Bidding System. Anthony D'Souza (EAS 19) will be taking over training/travel.

38. On May 4, 2005, Plaintiff learned she was being considered for a transfer to Southern Maryland. Management had previously asked for volunteers to take such a transfer. However, because this transfer would require either a Tour 1 or Tour 3 shift, both of which mandate working weekends and are the least desirable shifts, no one volunteered.

39. Plaintiff's name was considered because she had an accommodation that prevented her from supervising other employees.

40. On April 22, 2005, Leonard Adams forbade Plaintiff from attending an employee-

sponsored bone-marrow volunteer drive. Mr. Adams subsequently sent a subordinate employee to ascertain whether Plaintiff was at the drive, and if so, what she was doing there.

41. In April 2004, Leonard Adams gave facility keys to all other supervisors except Plaintiff.

42. In December 2003, Leonard Adams accused Plaintiff of taking a folder from his office that contained information pertaining to Plaintiff's EEO claim. Plaintiff denied taking the file. Mr. Adams had his supervisor, Lisa McNeil, call to accuse Plaintiff of taking the folder from Mr. Adams's office. Plaintiff denied taking the file. When Plaintiff reported these events to Louis Higginbotham, Maintenance Manager, he replied it was unlikely Leonard Adams even had a file and told Plaintiff not to worry about it.

43. In 2000, when Plaintiff was pulling out of the parking lot in her car, Michael Edwards was also pulling out of the employee parking lot in his car. When Mr. Edwards noticed Plaintiff, he tried to run her off the road by continually jumping into Plaintiff's lane, cutting her off. Plaintiff finally had to pull off the road and turn on to an unfamiliar road. Plaintiff complained, and management initially moved Plaintiff to a different parking arrangement. However, Leonard Adams voiced his negative response to the parking arrangements made for Plaintiff and announced he would have Plaintiff's car towed off the official lot.

44. On February 5, 1999, Plaintiff was threatened with termination if she did not transfer to a Tour 3 shift position.

45. In December 1998, Plaintiff was charged 24 hours of AWOL (i.e. leave without pay) while she was on injury leave.

46. In July 1998, Plaintiff was forced to transfer to a detail in the Southern Maryland post office once Michael Edwards was allowed to come back to work. This distressed Plaintiff because she knew Michael Edwards frequented the Bally's fitness gym, which was within one mile of the Southern Maryland post office. On one occasion, Ms. West was followed home from the Southern Maryland post office. She filed a police report documenting the ordeal.

47. An employee, Joseph Randy Mays, accused Plaintiff of posting a picture of Michael Edwards, which included Mr. Edwards's medical information.

48. On October 10, 1997, at Plaintiff's year-end performance review, Leonard Adams gave her a rating of "unacceptable" despite filling out a narrative of her accomplishments and trainings.

49. On May 5, 1997, Plaintiff was subject to an offensive and threatening cartoon that depicted a coffin and contained her name. This cartoon was left on all the employees' desks.

50. Plaintiff was required to take PEDC Self Study courses in Basic Electricity to receive an acceptable performance rating. No other supervisor, except for Samuel Brown, another employee at United States Postal Service, was required to take these courses. No other female supervisor was required to take these courses. Sam Brown's performance rating was changed to

"acceptable" after he completed PEDC Self Study Courses. Plaintiff's rating was not changed to "acceptable" after she completed PEDC Self Study Courses.

51.     On April 10, 1997 Leonard Adams informed Plaintiff she would be rated "unacceptable" because she was not supporting management. Mr. Adams said Plaintiff was not supporting management because she had filed an EEO complaint, had given information to the U.S. Postal Inspection Service, had filed a complaint with the National Association of Postal Services (NAPS), and had written a letter to Congressman Steny Hoyer detailing her complaints about the U.S. Postal Service.

52.     Leonard Adams told his supervisor, Jimmy Tihoe, he knew Plaintiff was responsible for encouraging Sandra Beverly, a United States Postal Service employee, to file an EEO sexual harassment complaint against him and threatened he would "get that bitch."

53.     Leonard Adams refused to grant Plaintiff's requests for time off.

54.     Leonard Adams required Plaintiff to work most holidays (e.g. Washington's Birthday, Mother's Day, and Memorial Day).

55.     Leonard Adams never provided Plaintiff an evaluation of her performance, except for her mid-year and end-year review, despite Plaintiff requesting such an evaluation.

56.    Leonard Adams undermined Plaintiff's authority by settling Step 1 grievances between Plaintiff's employees, a task that was part of Plaintiff's duties.

57.    Plaintiff was denied her request to work six days a week.

58.    United States Post Office management, including Leonard Adams and Tom Duschene, Manager of Maintenance, changed Plaintiff's days off nine times in one year, while he did not change the days off of any other supervisor.

59. Leonard Adams reassigned Plaintiff to different assignments multiple times without stated goals or objectives. On October 16, 1996, Leonard Adams reassigned Plaintiff to Supervisor Maintenance Operations of Building Services. When informing Plaintiff of reassignment, Mr. Adams stated to Plaintiff she should become his secretary. On February 15, 1997, Leonard Adams reassigned Plaintiff to Supervisor Maintenance Operations of BEM – Mechanics, Painters, and Welders. Although the previous employee in this position received Saturdays and Sundays off, Mr. Adams changed Plaintiff's days off to Thursdays and Fridays. Mr. Adams told Plaintiff he did this so she could spend more time with him. Due to the frequent absence of BEM Supervisor, Lesley Bailey, Plaintiff frequently had to supervise her husband, though this was not her official role.

60.    On August 11, 1997, Mr. Adams assigned Plaintiff to Supervisor Maintenance Operations of MPE. The allotted days off for this position were Sunday and Monday. However,

14

these days were changed to weekdays when Plaintiff was assigned this position, thereby requiring her to work on weekends.

61.    On May 27, 2005, Plaintiff presented Mr. Adams with a request for four hours of personal leave on May 31, 2005. On May 31, when it was time for Plaintiff to leave, Mr. Adams refused to allow her to do so, forcefully demanding her to meet with a co-worker instead. Plaintiff tried to negotiate reasonably, but when Mr. Adams continued his demands and became overbearing, Plaintiff's heart began pounding, and she felt excruciating pain shoot down her left arm and hand. Recognizing this as a symptom of a heart attack, Plaintiff quickly filled out a leave request for time to be taken out of her annual sick leave, stating the reason as a job-related injury, and was immediately taken to the hospital for examination.

62.    Despite Plaintiff filing proper paperwork, her paycheck indicated she has been charged with a total of 32 hours of leave without pay (LWOP) or absence without official leave (AWOL), which carries a disciplinary action.

63.    On April 22, 2005, Mr. Adams informed Plaintiff he was going to make staffing changes that would affect Plaintiff's duties effective June 04, 2005. Since Plaintiff left work on May 31, the sign showing her name has been removed from her office. Further, employees have been informed that their supervisor (i.e. Plaintiff) is out on sick leave. This violates Plaintiff's settlement agreement described above in that it was agreed she would not supervise employees.

15

64.     After being fully appraised of these allegations, defendant declined to take any steps to solve, address, or rectify the problem.

## Count II.  Denial of Advancement Opportunities

65.     Plaintiff incorporates allegations in paragraphs 1-64 above by reference.

66.     The United States Postal Service denied Plaintiff advanced opportunities based on her sex (female), retaliation, age (over 40), and disability (extreme stress and post-traumatic stress disorder).

67.     In November 2004, Plaintiff applied for a position that was eventually filled by a male employee.  The male employee did not have any disability.   When Plaintiff asked Leonard Adams why she was not awarded the position, he told Plaintiff she would not be awarded a managerial position without changing her settlement agreement with management prohibiting her from supervising employees.

68.     On October 10, 1997, at Plaintiff's year-end performance review, Mr. Adams gave her a rating of "unacceptable" despite him filling out a narrative of her accomplishments and trainings. This resulted in the loss of approximately $1,500 and a lower salary at present.

69.     Plaintiff applied for numerous positions within the United States Postal Service where she met the specified qualifications, but the positions were eventually filled by more able bodied male employees who had not engaged in any protected activity.

70.     After being fully appraised of these allegations, defendant declined to take any steps to solve, address, or rectify the problem.

## Count III.  Denial of Reasonable Accommodations

71.     Plaintiff incorporates allegations in paragraphs 1-70 above by reference.

72.     Plaintiff is a qualified individual with a disability, because she can perform all the essential job functions with a reasonable accommodation.

73.     Plaintiff has a disability (extreme stress and post-traumatic stress disorder) due to a job-related injury that occurred when a subordinate employee, Michael Edwards, threatened her life.

74.     Her mental condition substantially impacts her ability to think, interact with other people, and work.

75.     Accordingly, Plaintiff required the following accommodations: (1) not to work weekends due to Mr. Edwards' presence and minimal security at the Post Office during weekends; (2) not to have to park in the employee parking lot; (3) not to supervise other employees; and (4) not to

17

have a workstation/office in the general area of Mr. Edwards. These provisions have been in place for over five years. The United States Postal Service denied these reasonable accommodations.

76.    Plaintiff was required to work weekends at the Post Office.

77.    In December 2003, Plaintiff was required to park in the employee parking lot instead of special parking arrangements that would have allowed Plaintiff to enter from a separate entrance apart from the one Mr. Edwards used.

78.    Plaintiff was required to supervise employees, including the one who threatened her life, Mr. Edwards.

79.    Plaintiff was required to work in a cubicle near the employee who previously threatened her life, Mr. Edwards.

80.    After being fully appraised of these allegations, defendant declined to take any steps to solve, address, or rectify the problem.

## Count IV.  Retaliation

81.    Plaintiff incorporates the allegations in paragraphs 1-80 above by reference.

The United States Postal Service is retaliating against Plaintiff because she filed an EEO

complaint against it. Plaintiff cites the following examples of adverse action.

82.     On May 18, 2005, Leonard Adams, Manager of Maintenance Operations, informed
Plaintiff she was being moved to a position of supervisory capacity, where she would supervise
approximately 37 employees. This is in violation of her previous settlement agreement with
management that provides:

> i.    Plaintiff is to keep her current position, days off, and tour as
> previously promised. This includes the provision that Plaintiff is not
> to supervise any employees.
>
> ii.   Plaintiff's 1997 rating of "unacceptable" is to be changed to
> "acceptable", and the money Plaintiff would have gotten had she
> received an "acceptable" rating is to be given her pro-rata.
>
> iii.  Plaintiff is to retain her former parking arrangement revoked by Mr.
> Adams in 2003, which allowed her to park away from employee
> parking and near the gas pump or compound.
>
> iv.   Plaintiff would be assigned to a Grade 19 job in Labor Relations.
>
> v.    Plaintiff would be granted attorney fees of $1,500.
>
> vi.   Plaintiff would be granted compensatory damages of $10,000.

83.     On May 18, 2005, Mr. Adams informed Plaintiff she would have to work Saturdays.
This is a direct violation of her settlement accommodation prohibiting her from working on
weekends. Management directed this to be the case because of the likelihood of Mr. Edwards'

presence and the minimal level of security and other personnel in the building on such days. Mr. Adams disregarded management's directives in retaliation against Plaintiff.

84.     The group Mr. Adams assigned Plaintiff to supervise was previously supervised by Lisa Brown-McNeil. When Ms. Brown-McNeil was in this position, she was given Saturdays and Sundays off. Now that Plaintiff occupies this position, Mr. Adams suddenly feels weekend work is necessary for this position and cannot be given as time off.

85.     On May 18, 2005, Mr. Adams changed the type of work Plaintiff is to perform. Although Plaintiff held the title of Supervisor Maintenance Operations (EAS 17), she was performing administrative work normally handled by employees of higher pay levels. She was not receiving the requisite pay for such work. This is a violation of Equal Work, Equal Pay because Plaintiff was paid at a level 17 the entire time she performed these functions.

86.     The duties Plaintiff performed prior to her new assignment are being transferred to higher level employees. Steve Mummendey (EAS 23) will be responsible for the Maintenance Bidding System. Anthony D'Souza (EAS 19) will be taking over training/travel.

87.     On May 4, 2005, Plaintiff learned she was being considered for a transfer to Southern Maryland. Management had previously asked for volunteers to take such a transfer. However, because this transfer would require either a Tour 1 or Tour 3 shift, both of

which mandate working weekends and are the least desirable shifts, no one volunteered.

Plaintiff's name was considered because she had an accommodation that prevented her from supervising other employees.

88.    On April 22, 2005, Mr. Adams forbade Plaintiff from attending an employee-sponsored bone-marrow volunteer drive. Mr. Adams subsequently sent a subordinate employee to ascertain whether Plaintiff was at the drive, and if so, what she was doing there. This rises to the level of stalking and left the plaintiff in a very nervous state.

89.    In April 2004, Mr. Adams gave facility keys to all the other supervisors except Plaintiff.

90.    In December 2003, Mr. Adams accused Plaintiff of taking a folder from his office that contained information pertaining to Plaintiff's EEO claim. Plaintiff denied taking file. Mr. Adams had his supervisor, Lisa Brown-McNeil, call Plaintiff to accuse her of taking the folder from Mr. Adams's office. Plaintiff denied taking the file.

91.    When Plaintiff reported these events to Louis Higginbotham, Maintenance Manager, he replied it was unlikely Mr. Adams even had a file and told Plaintiff not to worry about it.

92.    In 2000, when Plaintiff was pulling out of the parking lot in her car, Michael Edwards was also pulling out of the employee parking lot in his car. When Mr. Edwards noticed Plaintiff, he tried to run her off the road by continually jumping into Plaintiff's lane, cutting her off. Plaintiff finally had to pull off the road and turn onto an unfamiliar road. Plaintiff complained,

and initially management moved Plaintiff to a different parking arrangement. However, Mr. Adams voiced his negative response to the parking arrangements made for Plaintiff and announced he would have Plaintiff's car towed off the official lot.

93.    On February 5, 1999, Plaintiff was threatened with termination if she did not transfer to a Tour 3 shift position that had Sundays and Mondays off.

94.    In December 1998, Plaintiff was charged 24 hours of AWOL (i.e. leave without pay) while she was on injury leave.

95.    In July 1998, Plaintiff was made to transfer to a detail in the Southern Maryland post office once Michael Edwards was allowed to come back to work. This distressed plaintiff, as she knew Michael Edwards frequented the Bally's fitness gym that was within a mile of the Southern Maryland post office. On one occasion, Ms. West was followed home. She filed a police report documenting the ordeal.

96.    On October 10, 1997, at Plaintiff's year-end performance review, Mr. Adams gave her a rating of "unacceptable" despite filling out a narrative of her accomplishments and trainings. Normally one manager handles all administrative aspects for the supervisors according to tour of duty. However, Steve Mummendey had been appointed to handling my paperwork even though he works the night shift, tour 1 from 11:30 pm to 7:30 a.m. In order to contact him, I was forced to come in late at night, leave a message or an envelope at the office. On or about November 30, 2005 Ms. West called and asked for a copy of her work performance evaluation for the year. At

that time, Steve Mummendey informed her that she would have to talk to Leonard Adams who would be evaluating her. Only Mr. Adams could provide her with a copy as only he handles her attendance. To date, Ms. West has yet to receive a copy of her work performance evaluation.

97.    On May 5, 1997, Plaintiff was subject to an offensive and threatening cartoon that depicted a coffin and contained her name. This cartoon was left on all the employees' desk.

98.    Plaintiff was required to take PEDC Self Study courses in Basic Electricity to receive an acceptable performance rating. No other supervisor, except for Samuel Brown, was required to take these courses. No other female supervisor was required to take these courses.

99.    Sam Brown's performance rating was changed to "acceptable" after he completed PEDC Self Study Courses. Plaintiff's rating was not changed to "acceptable" after she completed PEDC Self Study Courses.

100.    On April 10, 1997, Mr. Adams informed Plaintiff she would be given a rating of "unacceptable" because she was not supporting management. Mr. Adams said Plaintiff was not supporting management because she had filed an EEO complaint, had given information to the U.S. Postal Inspection Service, had filed a complaint with the National Association of Postal Services (NAPS), and had written a letter to Congressman Steny Hoyer that detailed her complaints about the Postal Service.

101.    Adams told his supervisor, Jimmy Tihoe, he knew Plaintiff was responsible for encouraging another Postal Service employee, Sandra Beverly, to file an EEO sexual harassment claim against him. Mr. Adams threatened he would "get that bitch."

102.    On May 27, 2005, Plaintiff presented Mr. Adams with a request for four hours of personal leave on May 31, 2005. On May 31, when it was time for Plaintiff to leave, Mr. Adams refused to allow her to do so, forcefully demanding her to meet with a co-worker instead. Plaintiff tried to negotiate reasonably, but when Mr. Adams continued his demands and became overbearing, Plaintiff's heart began pounding, and she felt excruciating pain shoot down her left arm and hand. Recognizing this as a symptom of a heart attack, Plaintiff quickly filled out a leave request for time to be taken out of her annual sick leave, stating the reason as a job-related injury, and was immediately taken to the hospital for examination.

103.    Despite Plaintiff filing proper paperwork, her paycheck indicated she has been charged with a total of 32 hours of leave without pay (LWOP) or absence without official leave (AWOL), which carries a disciplinary action. Steve Mummendey changed 24 hours of the 32 hours of AWOL to sick leave and later he changed the remaining 8 to sick leave.

104.    On April 22, 2005, Mr. Adams informed Plaintiff he was going to make staffing changes that would affect Plaintiff's duties effective June 04, 2005. Since Plaintiff left work on May 31, the sign showing her name has been removed from her office. Further, employees have been informed that their supervisor (i.e. Plaintiff) is out on sick leave. This violates Plaintiff's settlement agreement described above in that it was agreed she would not supervise employees.

24

105.    After being fully appraised of these allegations, defendant declined to take any steps to solve, address, or rectify the problem.

## Count V.   Breach of Equal Employment Opportunity Settlement Agreement

106.    Plaintiff incorporates allegations made in paragraphs 1-105 above by reference.

107.    Plaintiff offered a settlement agreement outlined above, and defendant accepted the agreement.

108.    Subsequently, defendant breached the settlement in the manner described above.

109.    Plaintiff filed an administrative charge alleging breach of the settlement agreement.

110.    Plaintiff exhausted all of her administrative remedies dealing with enforcement of the settlement agreement.

111.    After plaintiff informed defendant of breach, defendant continued to breach the agreement and made no effort to cure the breach.

## Count VI.   Unequal Pay

112.    Plaintiff incorporates paragraphs 1-111 by reference.

113.    Plaintiff was paid less than male employees, performing the equal work in violation of

the Equal Pay Act.


## Prayer for Relief


112.    Plaintiff Jacqueline West requests that this Court grant him the following relief:

A.    Compensatory damages including but not limited to back pay;

B.    Damages for emotional distress, mental anguish and humiliation, and other

compensatory damages;

C.    Prejudgment and post-judgment interest thereon;

D.    Any promotion and/or step increase he would have acquired but for the

discrimination;

E.    A declaratory judgment holding that the defendant failed to reasonably

accommodate the disabilities of plaintiff and the class members;

F.    A writ quo warranto;

G.    A writ of mandamus ordering defendant to take affirmative steps to correct

discriminatory practices

H.    Reasonable attorney's fees and costs

I.    Back pay and front pay;

J.    and permanent injunctions preventing further discriminatory acts;

K.    That this Court grant any and all such other relief as this Court may deem just and

proper;

L.    A favorable employment reference; and

M.    A trial by jury

DATED: _3-20-06_

Plaintiff

By Counsel

_Michael J. Beattie_

Michael J. Beattie, Esquire

D.C. Bar Number 450873

Employee Rights Law Group

9502-B Lee Highway

Fairfax, Virginia  22031

(703) 273-2235 (phone)

(703) 273-3440 (facsimile)

Certificate of Service certify that a copy of the foregoing is being sent to the United States Postal Service on this date _3-20-06_, 2006 via process server.