UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

NOV 3 - 2000

| | |
|---|---|
| JACQUELINE WEST, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. No. 99-1975 (TFH) |
| WILLIAM HENDERSON, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Pending before the Court is defendant's Motion for Summary Judgment. Upon careful consideration of defendant's Motion, plaintiff's opposition, defendant's reply, and the entire record herein, this Court will grant defendant's Motion.

### I. BACKGROUND

The following facts are undisputed. Plaintiff Jacqueline West ("plaintiff" or "West") has been employed by the United States Postal Service since 1991, as a Supervisor of Maintenance Operations ("SMO"), EAS 16. During the time at issue, there were twelve or thirteen other EAS-16 supervisors who shared the same job description as plaintiff. All EAS-16 SMOs were required to be knowledgeable about plumbing, mechanics, electricity, and electronics as they apply to the installation, maintenance, repair and modification of buildings, building systems, and mail processing and customer equipment. All SMOs were also required to have the ability to read and interpret blueprints, schematics, and technical drawings and diagrams, as well as the ability to manage the work of electronic technicians, mechanics and custodians to accomplish maintenance goals.

Plaintiff was detailed to the position of Manager of Maintenance Operations Support




AO 72A
(Rev 8/82)

EAS-18 from November 1995 through October 1996. Plaintiff hoped that this detail would become permanent. When Tom Duchesne ("Duchesne") arrived at the Washington, D.C. Processing and Distribution Center ("P&DC") as the Manager of Maintenance in 1996, he found that the Maintenance Department was $408,000 over cost for supplies in FY 1996; accordingly, Duchesne decided to assign a permanent manager to the stockroom and to hold such person accountable. In the meantime, West's detail ended and Duchesne returned her to her permanent position of SMO, EAS-16.

In November of 1996, Duchesne served as the selecting official for the position of Manager, Maintenace Operations Support, EAS-18, Vacancy Announcement No. 40-96. Plaintiff applied for this position and states that she read and followed the instructions provided with the application. Plaintiff was one of three individuals, the other two males, who were advanced for consideration for the position by the review committee. Duchesne had approximately one month to observe West's performance before he had to fill the permanent position. The position was filled by one of the two male applicants. At the time that he made the selection for Vacancy Announcement 40-96, Duchesne was unaware that West had engaged in EEO activity. Plaintiff believes that she was not selected for the position because of her gender.

Duchesne was dissatisfied with the fact that all permanent supervisors had weekends off and that many of the SMOs lacked the requisite knowledge necessary to perform their jobs competently. Accordingly, Duchesne mandated that all supervisors attend training courses with subject matter experts at the Postal Employee Development Center and also implemented a procedure whereby supervisors would be moved around more within the agency and would be accountable through ratings conducted on a semi-annual and annual basis.

2

AO 72A
(Rev 8/82)

Leonard Adams ("Adams") supervised plaintiff from October 1996 to August 1997 and provided West with a mid-year evaluation of "unsuccessful" in April 1997 and a final Merit Performance Evaluation of "unsuccessful" on October 10, 1997 for the period from September, 1996 through September, 1997. On March 9, 1997, Adams presented West with her first report card; in that report card, Adams noted deficiencies in a number of areas. He also noted that West needed training in Mail Processing Equipment ("MPE"), basic mechanics, electronics, and electricity, as well as help interpreting blueprints and schematics. On March 9, 1997, Adams gave West a document entitled "Supervisory Maintenance Operation Expectations," which gave SMOs examples of what was expected and described acceptable supervisory performance. West signed the document indicating that she was in agreement with the goals and objectives set forth therein and that she understood that her achievement or failure to achieve these goals would directly affect future merit increases and job status. After being rated as "unsuccessful" on her mid-year evaluation in April, 1997, West was put on a success improvement plan to help her accomplish her goals. At or about the same time, she was told that she did not have the knowledge, skills, and ability to supervise the MPE group. Of the other supervisors whose performance Adams evaluated, plaintiff is personally aware that two to three of these supervisors, one of whom was a female, received "met objectives/expectations" ratings. In addition to herself, plaintiff was aware of two other male supervisors who received "unsuccessful" ratings in their evaluation.

During his tenure, Duchesne implemented a procedure by which supervisors would be moved around within the P&DC divisions in order to get the best mix of supervisors and employees and to maximize resources. In accordance with this policy and in an effort to remedy

AO 72A
(Rev 8/82)

the perceived accountability and coverage problems caused by having no supervisors in the office on weekends, Duchesne changed plaintiff's scheduled workdays so that she was scheduled to work Saturdays and Sundays and was off on two weekdays instead; this resulted in an increase in West's salary due to premium pay. Although the particular days on which plaintiff was scheduled to work changed on occasion, the number of days that she was scheduled to work – five days a week – never changed. However, plaintiff preferred to have Saturdays and Sundays as her non-scheduled days.

During plaintiff's tenure at Washington, D.C. P&DC, on or about April 24, 1998, Ardine Harley ("Harley"), then Plant Manager, received a phone call from William Craig ("Craig") of the Postal Service's Crisis Management Team. Craig informed Harley that he had received a phone call from a doctor at Suburban Hospital, regarding a particular P&DC employee who was being treated for high blood pressure. The doctor explained that the employee was furious with two unnamed female supervisors at P&DC and that he was potentially homicidal. The doctor suggested that the employee should be removed from the supervision of female supervisors.

Thereafter, Harley immediately contacted the Employee Assistance Program (EAP) coordinator. Together the EAP coordinator and Harley decided to notify West and the other female supervisor assigned to the Maintenance Department where the employee worked. West and the other supervisor were informed on April 24, 1998 that the employee would not be returning to the facility until he was fully cleared, fit for duty and posed no threat to any employee. Harley also informed West that she would have weekends off starting immediately because he only wanted her working during the times when there was maximum security available to her at the P&DC. He also relieved West for her supervisory duties and permitted her

4

to park in the back of the P&DC in an effort to further protect her. West did not express any fear for her personal safety during this meeting and appeared to be satisfied with this arrangement.

In late May 1998, approximately five weeks after the incident, Harley determined that West could return to her normal tour. When he communicated to West his decision to return her to her normal tour, she indicated that she wanted her weekends off and that she was still afraid. Shortly thereafter, West filed a police report, sought medical attention for stress and filed a stress claim.[1] During June of 1998, West was out of work for stress-related complaints.

On or about June 30, 1998, the employee provided the medical unit with medical documentation clearing him to return to work. In early July, 1998, West accepted the management's offer of a detail assignment at the Southern Maryland P&DC.[2] West bid on a position for SMO, EAS-16, at the Southern Maryland P&DC and was selected for the position. However, she declined the position because the non-scheduled days were Tuesday and Wednesday. West remained on detail at the Southern Maryland facility until January, 2000.

Plaintiff first contacted an EEO counselor on or about February 12, 1997. In that complaint, plaintiff identified fifteen incidents that she alleged were the result of discrimination by various male supervisors. During the pendency of the administrative claim, plaintiff initiated and filed three additional charges in 1997 through 1999. On July 21, 1999, plaintiff filed a civil action in this Court, alleging violations of Title VII on the grounds of sexual discrimination and retaliation. On September 12, 2000, defendant filed the instant Motion for Summary Judgment.

---

[1] West's stress claim was denied by the Department of Labor.

[2] This position was first offered to West in early May, 1998, but she initially rejected the offer.

5

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995). A genuine issue of fact is one which could change the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

To defeat summary judgment, an issue of fact in dispute must be both genuine and material – one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. Anderson, 477 U.S. at 248. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). To avoid summary judgment, the non-moving party must state specific facts or present some objective evidence to establish a genuine dispute. Celotex, 477 U.S. at 322-23. Unsupported speculation or bald allegations in the absence of any objective evidence is insufficient to defeat a summary judgment motion; moreover, evidence of discrimination that is "merely colorable" or "not significantly probative" cannot prevent the issuance of summary judgment. Johnson v. Digital Equipment Corp., 836 F. Supp. 14, 15 (D.D.C. 1993).

## III. DISCUSSION

### A. Failure to Exhaust Administrative Remedies

To properly exhaust administrative remedies and raise a cognizable claim under Title VII,

6

AO 72A
(Rev 8/82)

a plaintiff must initially contact an EEO counselor within forty-five days of the plaintiff's notification of the alleged discriminatory event. Park v. Howard University, 71 F.3d 904, 907 (D.C. Cir. 1995); 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.105(a)(1). The 45-day time requirement is not jurisdictional, but operates like a statute of limitations. Bayer v. U.S. Dep't of Treasury, 956 F.2d 330, 332 (D.C. Cir. 1992); see also Gilmore v. Reno, 33 F. Supp. 2d 20, 24 (D.D.C. 1998). Plaintiff bears the burden of pleading and proving equitable reasons for any failure to comply with this 45-day requirement. Bayer, 956 F.2d at 333. Moreover, "the court's equitable power to toll the statute of limitations will be exercised only in extraordinary and carefully circumscribed circumstances and does 'not extend to what is at best a garden variety claim of excusable neglect.'" Washington v. Washington Metropolitan Area Transit Authority, 160 F.3d 750, 752 (D.C. Cir. 1998).

Given the undisputed fact that plaintiff first met with the EEO counselor on or about February 12, 1997, the following claims were not timely raised: (1) the termination of her detail in October, 1996; (2) her non-selection for the EAS-18 Manager of Maintenance Operations position announced on November 8, 1996; (3) her allegedly "unfair performance evaluation for FY-1996," provided in October, 1996; and (4) her "request" to work six days per week. In her opposition, plaintiff concedes that these claims were not timely raised. Since it is undisputed that these claims were not administratively exhausted, the survival of these allegations rests entirely on plaintiff's arguments in support of equitable tolling. Here, plaintiff has failed to introduce any legitimate basis upon which to disregard the clear statutory and regulatory requirements of administrative exhaustion applicable to this case.

With regard to her non-selection for the EAS-18 Manager of Maintenance Operations

7

position, plaintiff contends that this Court should equitably toll the statutory and regulatory standards to which all claimants are held because "the date that the Plaintiff became aware that a male craft employee had been awarded the position is still at issue." See Pl's Opp. at 9. However, it is undisputed that this position was filled on November 8, 1996. See Def's Statement of Material Facts as to Which There is No Genuine Issue ¶ 60; Pl's Reply to Def's Statement at ¶ 60 ("undisputed"); see also Duchesne Decl. ¶ 18. Plaintiff offers no evidence to suggest that she was unaware in November, 1996 that she had not been selected for this position or that a male was selected for the position. Additionally, she offers no evidence of when, if ever, she received information that led her to believe that she had been discriminated on the basis of her gender.[3] Instead, she vaguely suggests, without any evidentiary support, that "the time frame is arguably in the eighty to ninety-five day range for her subsequent notice of complaint to the Postal service." See Pl's Opp. at 9. Such unsupported assertions do not meet the high standards upon which courts find extraordinary circumstances justifying an equitable tolling of the statutory time limitations for initiating EEO process. Accordingly, plaintiff's claim of non-selection for the EAS-18 Manager of Maintenance Operations position is dismissed.[4]

With respect to the plaintiff's claims of termination from her detail in October of 1996, her "unfair performance evaluation for FY-1996, and her "request" to work six days per week,

---

[3]  Plaintiff also offers no explanation whatsoever of the basis for her conclusion of discrimination.

[4]  Defendant also argues that plaintiff cannot overcome defendant's legitimate non-discriminatory explanation for this non-selection; however, since the Court finds that this claim was not timely raised and that there are no equitable reasons to justify tolling the time limitations in this case, the Court need not address defendant's alternative argument.

8

plaintiff wholly fails to address the reasons for her untimeliness. Instead, plaintiff merely hints that the Court should simply disregard the statutory and regulatory language applicable to federal employers because:

> this miserly time limit -- especially when compared to the one hundred and eighty day time frame granted private sector employees -- did not and could not, allow the plaintiff sufficient time to inform herself whether [she may have a claim] . . . .

See Pl's Opp. at 10. It is plaintiff's obligation to affirmatively plead and prove any equitable reasons for failing to meet the requirement of bringing the Title VII complaint to the attention of the agency's EEO counselor within the mandated time frame. Albritton v. Kantor, 944 F. Supp. 966, 971 (D.D.C. 1996) (citing Saltz v. Lehman, 672 F.2d 207, 209 (D.C. Cir. 1982)). The fact that plaintiff generally objects to the statute's time limitations is insufficient to meet this burden. Because plaintiff has made no effort to explain the particular circumstances that made the forty-five day time limit inadequate in her case, the Court cannot equitably toll the exhaustion requirements in this case.

**B. Absence of Adverse Employment Action**

In order to prevail in a cause of action under Title VII, a plaintiff must initially establish at least a *prima facie* case of prohibited discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). To establish a *prima facie* case of gender discrimination, a plaintiff must demonstrate by a preponderance of the evidence that: (1) she is a member of the protected class; (2) an adverse personnel action occurred; and (3) she and a similarly situated, unprotected employee received dissimilar treatment. Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999); see also Douglas v.

9

Pierce, 707 F. Supp. 567 (D.D.C. 1988), aff'd, 906 F.2d 783 (D.C. Cir. 1990).

An adverse personnel action is defined as any action accompanied by "materially adverse consequences affecting terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." Brody, 199 F.3d at 457. To satisfy Title VII's adverse action requirement, a plaintiff must make a "clear showing" of a "material, adverse employment action" that involves "tangible economic effect" on plaintiff's employment. Id. at 454. This Circuit has clearly held that an adverse personnel decision for purposes of a discrimination or retaliation claim exists only when the action is an ultimate employment decision, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." Id. Interlocutory or mediate decisions, dissatisfaction with the work assigned, and mere changes to working duties or working conditions do not rise to the level of an adverse employment action. Id.; Carpenter v. Federal Nat'l Mortgage Assoc., 949 F. Supp. 26, 28 and n.3 (D.D.C. 1996); see also Page v. Bolger, 645 F.2d 227, 233 (4th Cir.) (en banc), cert. denied, 454 U.S. 892 (1981); Mattern v. Eastman Kodak Co., 104 F.3d 702 (5th Cir.), cert. denied, 118 S. Ct. 336 (1997).

The Court agrees with defendant that the following claims are not actionable, adverse employment actions under Title VII: (1) Supervisor Adams "undermined her authority" by resolving a grievance one of her subordinates had filed with the Union; (2) plaintiff was not evaluated at her request; (3) plaintiff's supervisor failed to notify her in advance that her request for leave on Mother's Day had been approved, resulting in her reporting to work; (4) plaintiff was required to attend training with all supervisors on one of her scheduled days off; (5) plaintiff

10

AO 72A
(Rev 8/82)

was scheduled in 1997 to work several holidays which fell on her otherwise scheduled workdays; (6) in April, 1997, plaintiff was evaluated as "unsuccessful" at her mid-year and year-end performance reviews; (7) in April, 1997, Adams allegedly made the statement, which plaintiff claims referred to her, that he was "going to get those bitches"; (8) plaintiff was not permitted to work six days a week in October of 1996, while one other supervisor was permitted to do so<sup>5</sup>; (9) plaintiff's detail was terminated in October of 1996 allegedly in retaliation for some unspecified activity[6]; (10) in May of 1997, plaintiff "felt threatened" by a caricature posted by an unknown individual related to plaintiff's management style; (11) in May of 1998, plaintiff was offered a detail in Southern Maryland in order to protect her from a possibly threatening employee but such detail was apparently not plaintiff's preferred detail; (12) in June of 1998, plaintiff was "accused of using excessive personal leave"; (13) plaintiff's scheduled days off changed on occasion and plaintiff did not have the days off that she preferred; and (14) plaintiff's rotation to various functional areas within her job description allegedly lowered her performance evaluation.

Plaintiff's claims regarding her supervisor's settlement of one of her subordinate's grievances, defendant's alleged failure to evaluate plaintiff at her request, and defendant's alleged failure to timely notify plaintiff of the approval of her request for leave on Mother's Day do not constitute adverse employment actions since they had no effect on any term or condition of plaintiff's employment. Plaintiff's unsupported assertion that her authority was undermined

---

[5] As discussed above, this claim must be dismissed since it was not timely raised and plaintiff has failed to assert any legitimate reason for equitable tolling in this case.

[6] As discussed above, this claim must be dismissed, since it was not timely raised and plaintiff has not provided the Court with a legitimate reason for equitable tolling in this case.

11

AO 72A
(Rev 8/82)

and that "it caused her subordinates to believe that she did not have the backing of management," see Pl's Opp. at 5, simply fails to amount to a significant change in benefits. See Brody, 199 F.3d at 454.

Moreover, plaintiff's claims regarding the requirement that she attend training on one of her days off, the fact that she was scheduled to work on several holidays which fell on other otherwise scheduled work-days, and that she was not permitted to work six days a week are not actionable, because, as plaintiff concedes, defendant compensated her for the training session day with an alternate day off, the holidays were scheduled work-days for her and that she did not submit leave requests to have these days off, and plaintiff was not eligible for overtime compensation as an exempt employee. See West Deposition ("West I" and "West II" attached to Def's Mot.): West I at 12, 129; West II at 29. "Mere idiosyncracies of personal preference are not sufficient to state an injury." Brody, 199 F.3d at 457.

Furthermore, her rating as "unsuccessful" at her 1997 mid-term review and her 1997 year-end performance evaluation do not constitute an adverse employment action since there were no monetary or other consequences associated with these reviews and plaintiff concedes that these evaluations had no bearing on the terms and conditions of her employment.[7] See West

---

[7] Moreover, even if these reviews were adverse employment actions, these claims would fail because plaintiff has not overcome the defendant's legitimate, non-discriminatory explanation for these actions. Where defendant has offered a legitimate, non-discriminatory reason for its actions, plaintiff must then respond with objective evidence that defendant's reason is a mere pretext for a discriminatory motive. See Aka, 156 F.3d at 1289. A "plaintiff's denial of defendant's articulated reason without producing substantiation for the denial is insufficient to withstand a motion for summary judgment." Phillips v. Holladay Property Servs., Inc., 937 F. Supp. 32, 35 n.2 (D.D.C. 1996), aff'd, Nos. 96-7202, 96-1025, 1997 WL 411695 (D.C. Cir. 1997). In the mid-year review, plaintiff's supervisor states that "[u]p to now Ms. West has shown signs that she has no idea

12

AO 72A
(Rev 8/82)

I at 139. Not everything that makes an employee unhappy is an actionable adverse action; "the federal courts cannot be wheeled into action for every workplace slight, even one that was possibly based on protected conduct." Rowland v. Riley, 5 F. Supp. 2d 1, 3 (D.D.C. 1998), Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996).

Adams' alleged statement about "going to get those bitches" does not rise to the level of adverse employment action, because it was a single, isolated incident and plaintiff has not sufficiently alleged a pattern or practice which could make this conduct so egregious as to "alter the conditions of [her] employment." See Henry v. Guest Services, 902 F. Supp. 245, 252 (D.D.C. 1995), aff'd, 98 F.3d 646. Likewise, plaintiff's allegation that she felt threatened by a caricature posted by an unknown individual provides the Court with no basis to find an adverse employment action; again, this was a single isolated incident rather than a pattern or practice of discrimination or retaliatory behavior. These types of complaints, without evidence of a pervasive pattern or practice of discrimination, are the types of workplace frustrations for which

---

of what is going on in her operation. Although she has received significant training in Maintenance operations and maintenance management . . . on numerous occasions when I have questioned Ms. West about the daily activities in her operation she has demonstrated that she does not have a clue as to what is going on. Even after having her deficiencies in knowledge of her operation pointed out to her, Ms. West has taken minimal if any effort to acquire this necessary skill." Plaintiff's only response to this evaluation is that it must have been in retaliation for her prior EEO Complaint and because of her gender. She believes that she should have been rated "at least met objectives" because she had not been disciplined or done anything she was prohibited from doing. West II at 124. However, there is no evidence in the record that this supervisor was even aware of plaintiff's EEO complaint; moreover, it is undisputed that, of the other supervisors whom Adams evaluated, two to three – one of whom was a female – received "met objectives/expectations" ratings. West II at 133-34. Thus, plaintiff has provided no evidence to overcome the legitimate, non-discriminatory explanation for her evaluations and summary judgment would be appropriate

13

adjudication would lead to the "judicial micromanagement of business practices" which this Circuit warned against in Brody. See Brody, 199 F.3d at 452.

Plaintiff's claim regarding the termination of her Manager of Maintenance Operations Support, EAS-18, detail is also not actionable, because although plaintiff hoped that the detail would become permanent, it was by its very nature a temporary assignment and plaintiff does not allege that she was guaranteed or in any way promised that this position would become permanent. A termination of a detail, or other temporary assignment, upon its expiration cannot form the basis of an adverse employment action merely because the detail was at a higher rate of pay than plaintiff's permanent job.

Plaintiff's claim regarding the detail position in Southern Maryland which was apparently offered to her in order to protect her from the threat of another employee is not an adverse employment action, because plaintiff retained the same job title and description, as well as the same rate of pay. Mere inconveniences or alterations of job responsibilities or "marginal distinctions with uncertain consequences" do not rise to the level of adverse action. Jones v. Billington, 12 F. Supp. 2d 1, 14 (D.D.C. 1997); see also Crenshaw v. Georgetown University, 23 F. Supp. 2d 11 (D.D.C. 1998), aff'd, 194 F.3d 173 (D.C. Cir. 1999) (holding that a change in duties without corresponding reduction in pay is not an adverse action). Furthermore, this action was taken in order to protect plaintiff and was only an offer which plaintiff had the opportunity to accept or decline; this is hardly the type of action which would constitute an adverse employment action for purposes of Title VII.

Plaintiff also complains that she was accused of taking excessive personal leave. However, even assuming that this accusation was made, plaintiff has not identified any adverse

14

employment consequence of this statement. Conduct that may offend an employee, but that does not hinder an employee's performance does not rise to the level of adverse action. See Jones, 12 F. Supp. 2d at 13-14. Since this Court has no evidence that any terms or conditions of plaintiff's employment were affected by this alleged accusation, the Court cannot find that it constituted an adverse employment action.

Finally, plaintiff's claim that her scheduled days off changed on occasion such that plaintiff did not have off the days that she preferred and her claim that her rotation among various functional areas within her job description lowered her performance evaluation do not constitute adverse employment actions. First, plaintiff concedes that she was not the only EAS-16 supervisor rotated among departments and that, not only did other male supervisors have their scheduled days-off changed, but that she suffered no adverse employment consequence of the scheduling changes. See West I at 49-50. The only proven effect that the change in days off had on West was that her wage increased when she was assigned to work on the days that she would have preferred to be non-scheduled days. See West I at 55. Moreover, there does not appear to be any tangible effect to her rotation among functional areas within her job description. Although plaintiff now disputes whether the rotation was "beneficial to the terms and conditions of employment," she previously stated in her deposition that she benefitted from working in the four functional areas for which EAS-16 supervisors are responsible. West I at 47-48. However, regardless of whether she believes these rotations were beneficial or harmful in the long run, the fact remains that they do not constitute adverse employment actions under the law of this Circuit Reassignment within a division, without a demotion or other reduction in salary or benefits does not constitute adverse action. See Brody, 199 F.3d at 452 ("changes in assignments or work-

related duties do not ordinarily constitute adverse employment actions if unaccompanied by a decrease in salary or work hour changes"); Crenshaw, 23 F. Supp. 2d at 18 (holding that a change in duties without corresponding reduction in pay is not an adverse action); see also Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994). Moreover, since other EAS-16 supervisors, both male and female, were rotated among functional areas within their job descriptions, see Duchesne Decl. ¶ 12, plaintiff and similarly situated unprotected employees did not receive dissimilar treatment in this regard; therefore, plaintiff cannot establish a prima facie case of discrimination. See Brody, 199 F.3d at 452; Douglas, 707 F. Supp. at 572.

In summary, plaintiff's claims do not constitute adverse employment actions for purposes of Title VII according to the law of this Circuit. Therefore, since there are no material facts in dispute and since defendant is entitled to judgment as a matter of law, this Court will grant defendant's Motion for Summary Judgment.

## IV. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment is granted and this case is dismissed with prejudice. An order will accompany this Opinion.

November 3rd, 2000

Thomas F. Hogan
United States District Judge

16

AO 72A
(Rev 8/82)