# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Jacqueline West,                         )
       Plaintiff                 )
                               )    Case Number: <u>06-00531-HHK</u>

v.                              )
                               )

John Potter in his official capacity as   )    JURY DEMAND
Postmaster General of the          )
United States Postal Service,       )
       Defendant              )

## <u>Amended Complaint</u>

## Introduction

1. Plaintiff, Jacqueline West (hereinafter referred to as Mrs. West or plaintiff), began work for defendant in October 1996 as Acting Manager, Maintenance Operations Support.

2. Plaintiff is an employee of defendant, and defendant is an employer within the meaning of Title VII of the Civil Rights Act.

3. Jacqueline West is an individual who is, and at all times relevant herein was, a resident of Upper Marlboro, in the State of Maryland.

4. Defendant John Potter serves and Postmaster General of the United States Postal Service. He is sued in his official capacity.

5. Defendant issued a partial acceptance and partial dismissal letter of the formal EEO Complaint on August 23rd, 2005.   Plaintiff could not litigate the dismissed issues until the conclusion of the investigation.   This complaint includes both the accepted and dismissed allegations.

6.  Defendant issued a report of investigation on November 9, 2005, and counsel for plaintiff received the investigation on November 14, 2005.   The cover letter associated with the investigation granted plaintiff a right to file a private right of action in federal court within 90 days of November 14th.

7.  Unless enjoined, plaintiff will suffer irreparable harm including but not limited to risk of physical violence and intentional infliction of mental anguish.

8.  Defendant's regulations require the agency to attempt resolution via mediation. Although not required to do so, plaintiff requested mediation, but defendant refused to provide mediation or other alternative dispute resolution.

9.  This complaint is severable.   Should the court uphold the partial dismissal of the EEO complaint, plaintiff asks that the court view the dismissed allegations as background information.

## Venue

10. Venue is proper, because plaintiff works for defendant in Washington D.C., records related to her employment are in Washington D.C., and defendant's principal place of business is Washington D.C.

## Jurisdiction

11. The court has subject matter jurisdiction under the Civil Rights Act and based upon the fact an officer of an instrumentality of the United States is a defendant.

12. This action arises under the Title VII of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act of 1973.

13. Plaintiff worked for defendant full-time. Plaintiff is a U.S. citizen.  She therefore meets the legal definition of an employee, and defendant as an employer as those terms are

define under Title VII.

## Exhaustion of Administrative Remedies

14. Plaintiff properly exhausted all of her administrative remedies and proceeds after receiving the final agency decision on December 29, 2005.

## Statement of Facts

15. Ms. West was hired as an employee for the U.S. Postal Service in New York City on or about December 13, 1981 and held various positions.  In June 1993, she was promoted to Supervisor of Maintenance Operations at the Washington, DC plant.  She continued to work as a Supervisor of Maintenance Operations until May 31, 2005. She was assigned to the agency's Cursee-Morris Processing and Distribution Center.  Plaintiff's work site is located in the vicinity of Washington, D.C.

16. Defendant paid plaintiff a salary of $58,828 per year.

17. As Supervisor of Maintenance Operations, the Plaintiff's duties included, but were not limited to:

    a)  According to USPS Official Job Description for Supervisor, Maintenance Operations, dated October 1992 the functional purpose of this position is to supervise an assigned group of building and equipment maintenance, and custodial activities at a mail processing center/facility.

    b)  Complainant handled the maintenance bidding system for about two(2) years, which had previously been performed by Steve Mummenday, Manager Maintenance Operations, level 23, where as she was paid at level 17.

    c)  In approximately 2004, Ms. West was assigned travel for Maintenance, but told to train Anthony D'Souze, level 19, to take over the travel portion of training which

began May 31, 2005.

d)  Posting bids

e)  Step 2 grievances - Louis Higginbotham, Manager of Maintenance was responsible for the handling of Maintenance grievances at the second level of the grievance procedure.  Supervisors were responsible for grievances at the first level of the grievance procedure.  Effective March of 2000, Louis Higginbotham delegated his authority over to Plaintiff, and she was assigned to handle all maintenance grievances at the second level of the grievance procedure for maintenance. These duties constituted a portion of the administrative reasonable accommodations.

f)  Attend arbitrations along with other supervisors and managers

g)  Handled attendance control for maintenance

18. Male employees were paid at levels 19 and 23 for the same work she was paid at level 19. Steve Mummendey was paid at level 22 for the time he handled the maintenance bidding system.  He is currently being paid at level 23 now that he has taken over the maintenance bidding system during Ms. West's absence.

19. Ms. West is an African-American, female who suffers from Post Traumatic Stress Disorder.  This disorder was brought on by continuous threats, harassment and retaliation by Leonard Adams.  She provided medical evidence of her disorder to Miguel Ghersi for Leonard Adams, Engineering Specialist Anthony D'Souza and Acting Manager of Maintenance, Damone Williams.  Therefore, Mr. Adams was aware of Ms. West's disability.  Medical documentation dated June 17, 2005 and July 13, 2005 from Kim B. Jones-Fearing, M.D. indicates that Ms. West has been diagnosed with Post Traumatic

Stress Disorder and concurrent mood disorder.  Ms. West has received ongoing medical care for this impairment.

20. Ms. West had filed a prior EEO complaint against Mr. Adams on or about October 24, 1997 alleging discrimination, sexual harassment and retaliation.  Leonard Adams was aware of Ms. West's prior activity and had made reference to it on several occasions.  Mr. Adams has acted on his threat to "get that bitch" due to her prior EEO activity after another employee she supervised filed an EEO claim against Leonard Adams and won.

21. Prior to having her life threatened, Ms. West supervised mechanics and that after the EEO complaints, she was reassigned by Leonard Adams to supervise custodians and she was denied weekends off.

22. Ms. West did not formally speak to a management official regarding her claim of not being paid at a higher level because Mr. Adams specifically informed her not to talk to him about her job.  A male supervisor was offered Ms. West's administrative duties and she was informed that this reasonable accommodation was being revoked from her.

23. Ms. West has experienced higher levels of stress contributing to Post Traumatic Stress Disorder (PTSD) requiring a higher dosage of her medications.  Beginning June 2005, she began receiving almost weekly counseling for her impairment.  Therefore, because of more frequent doctor visits and increased medication, she has been unable to work since May 31, 2005.

24. Plaintiff has rendered outstanding service and performed her duties in a commendable and highly efficient manner.

25. Plaintiff, Jacqueline West, was harassed based on her sex (female), age (over 40), and disability (extreme stress and post-traumatic stress disorder) by Defendant, the United States Postal Service.

26. On May 18, 2005, Leonard Adams, Manager of Maintenance Operations, informed Plaintiff she was being moved to a position of supervisory capacity, where she would supervise approximately 37 employees. Such movement is in retaliation against Plaintiff. This action violated of her previous settlement agreement with management that provides, in part:

    i.  Plaintiff is to keep her current position, days off, and tour as previously promised. This includes the provision that Plaintiff is not to supervise any employees.

    ii.  Plaintiff's 1997 rating of "unacceptable" is to be changed to "acceptable", and the money Plaintiff would have gotten had she received an "acceptable" rating is to be given her pro-rata.

    iii.  Plaintiff is to retain her former parking arrangement revoked by Mr. Adams in 2003, which allowed her to park away from employee parking and near the gas pump or compound.

27. Not only is Plaintiff being required to supervise employees in violation of her previous settlement agreement with management, but Plaintiff is being made to supervise an unusually large amount of employees. The average number of employees under a supervisor is 15-20. Plaintiff is supervising approximately 37 employees.

28. The group of employees Plaintiff is being made to supervise potentially includes

Michael Edwards, the employee who threatened her life and subsequently tried to kill her by running her vehicle off the road.. Although she was not assigned to supervise Mr. Edwards directly, she will in fact be in such a position when all other supervisors are absent.

29. The group of employees Plaintiff is being made to supervise is the least desirable group to supervise because of its reputation as an especially difficult group with which to work. Supervising this group significantly decreases her potential for promotion.

30. On May 18, 2005, Mr. Adams informed Plaintiff she would have to work Saturdays.

31. This is a direct violation of her settlement accommodation prohibiting her from working on weekends. Management directed this to be the case because of the likelihood of Mr. Edwards' presence and the minimal level of security and other personnel in the building on such days. Mr. Adams disregarded management's directives in retaliation against Plaintiff. The group Plaintiff was assigned to begin supervising effective June 4, 2005 was previously supervised by Lisa Brown-McNeil. When Ms. Brown-McNeil was in this position, she was given Saturdays and Sundays off. Now that Plaintiff occupies this position, Mr. Adams suddenly feels weekend work is necessary for this position and cannot be given as time off.

32. On May 18, 2005, Mr. Adams informed Plaintiff she would have to vacate her office space, which was isolated from Michael Edwards, and move to an open-area supervisor's office. Mr. Edwards frequents this area as part of his daily activities because his supervisor is also located there.

33. On May 18, 2005, Mr. Adams changed the type of work Plaintiff is to perform. Although Plaintiff held the title of Supervisor Maintenance Operations (EAS 17), she was

performing administrative work normally handled by employees of higher pay levels. She was not receiving the requisite pay for such work. The duties Plaintiff performed prior to her new assignment are being transferred to higher level employees. Steve Mummendey (EAS 23) will be responsible for the Maintenance Bidding System. Anthony D'Souza (EAS 19) will be taking over training/travel.

34. On May 4, 2005, Plaintiff learned she was being considered for a transfer to Southern Maryland. Management had previously asked for volunteers to take such a transfer. However, because this transfer would require either a Tour 1 or Tour 3 shift, both of which mandate working weekends and are the least desirable shifts, no one volunteered.

35. Plaintiff's name was considered because she had an accommodation that prevented her from supervising other employees.

36. On April 22, 2005, Leonard Adams forbade Plaintiff from attending an employee-sponsored bone-marrow volunteer drive. Mr. Adams subsequently sent a subordinate employee to ascertain whether Plaintiff was at the drive, and if so, what she was doing there.

37. In April 2004, Leonard Adams gave facility keys to all other supervisors except Plaintiff.

38. In December 2003, Leonard Adams accused Plaintiff of taking a folder from his office that contained information pertaining to Plaintiff's EEO claim. Plaintiff denied taking the file.

39. Mr. Adams had his supervisor, Lisa McNeil, call to accuse Plaintiff of taking the folder from Mr. Adams's office. Plaintiff denied taking the file. When Plaintiff reported these events to Louis Higginbotham, Maintenance Manager, he replied it was unlikely Leonard Adams even had a file and told Plaintiff not to worry about it.

40. In 2000, when Plaintiff was pulling out of the parking lot in her car, Michael Edwards was also pulling out of the employee parking lot in his car. When Mr. Edwards noticed Plaintiff, he tried to run her off the road by continually jumping into Plaintiff's lane, cutting her off. Plaintiff finally had to pull off the road and turn on to an unfamiliar road. Plaintiff complained, and management initially moved Plaintiff to a different parking arrangement. However, Leonard Adams voiced his negative response to the parking arrangements made for Plaintiff and announced he would have Plaintiff's car towed off the official lot.

41. On February 5, 1999, Plaintiff was threatened with termination if she did not transfer to a Tour 3 shift position.

42. In December 1998, Plaintiff was charged 24 hours of AWOL (i.e. leave without pay) while she was on injury leave.

43. In July 1998, Plaintiff was forced to transfer to a detail in the Southern Maryland post office once Michael Edwards was allowed to come back to work. This distressed Plaintiff because she knew Michael Edwards frequented the Bally's fitness gym, which was within one mile of the Southern Maryland post office. On one occasion, Ms. West was followed home from the Southern Maryland post office. She filed a police report documenting the ordeal.

44. An employee, Joseph Randy Mays, accused Plaintiff of posting a picture of Michael Edwards, which included Mr. Edwards's medical information.

45. On October 10, 1997, at Plaintiff's year-end performance review, Leonard Adams gave her a rating of "unacceptable" despite filling out a narrative of her accomplishments and trainings.

46. On May 5, 1997, Plaintiff was subject to an offensive and threatening cartoon that depicted a coffin and contained her name.  This cartoon was left on all the employees' desks.

47. Plaintiff was required to take PEDC Self Study courses in Basic Electricity to receive an acceptable performance rating.  No other supervisor, except for Samuel Brown, another employee at United States Postal Service, was required to take these courses.  No other female supervisor was required to take these courses.   Sam Brown's performance rating was changed to "acceptable" after he completed PEDC Self Study Courses.  Plaintiff's rating was not changed to "acceptable" after she completed PEDC Self Study Courses.

48. On April 10, 1997 Leonard Adams informed Plaintiff she would be rated "unacceptable" because she was not supporting management.  Mr. Adams said Plaintiff was not supporting management because she had filed an EEO complaint, had given information to the U.S. Postal Inspection Service, had filed a complaint with the National Association of Postal Services (NAPS), and had written a letter to Congressman Steny Hoyer detailing her complaints about the U.S. Postal Service.

49. Leonard Adams told his supervisor, Jimmy Tihoe, he knew Plaintiff was responsible for encouraging Sandra Beverly, a United States Postal Service employee, to file an EEO sexual harassment complaint against him and threatened he would "get that bitch."

50. Leonard Adams refused to grant Plaintiff's requests for time off.

51. Leonard Adams required Plaintiff to work most holidays (e.g. Washington's Birthday, Mother's Day, and Memorial Day).

52. Leonard Adams never provided Plaintiff an evaluation of her performance, except for her mid-year and end-year review, despite Plaintiff requesting such an evaluation.

53. Leonard Adams undermined Plaintiff's authority by settling Step 1 grievances between Plaintiff's employees, a task that was part of Plaintiff's duties.

54. Plaintiff was denied her request to work six days a week.

55. United States Post Office management, including Leonard Adams and Tom Duschene, Manager of Maintenance, changed Plaintiff's days off nine times in one year, while he did not change the days off of any other supervisor.

56. Leonard Adams reassigned Plaintiff to different assignments multiple times without stated goals or objectives.  On October 16, 1996, Leonard Adams reassigned Plaintiff to Supervisor Maintenance Operations of Building Services.  When informing Plaintiff of reassignment, Mr. Adams stated to Plaintiff she should become his secretary.   On February 15, 1997, Leonard Adams reassigned Plaintiff to Supervisor Maintenance Operations of BEM – Mechanics, Painters, and Welders.   Although the previous employee in this position received Saturdays and Sundays off, Mr. Adams changed Plaintiff's days off to Thursdays and Fridays.  Mr. Adams told Plaintiff he did this so she could spend more time with him.  Due to the frequent absence of BEM Supervisor, Lesley Bailey, Plaintiff frequently had to supervise her husband, though this was not her official role.

57. On August 11, 1997, Mr. Adams assigned Plaintiff to Supervisor Maintenance Operations of MPE.  The allotted days off for this position were Sunday and Monday. However, these days were changed to weekdays when Plaintiff was assigned this position, thereby requiring her to work on weekends.

58. On May 27, 2005, Plaintiff presented Mr. Adams with a request for four hours of personal leave on May 31, 2005.  On May 31, when it was time for Plaintiff to leave, Mr.

Adams refused to allow her to do so, forcefully demanding her to meet with a co-worker instead. Plaintiff tried to negotiate reasonably, but when Mr. Adams continued his demands and became overbearing, Plaintiff's heart began pounding, and she felt excruciating pain shoot down her left arm and hand. Recognizing this as a symptom of a heart attack, Plaintiff quickly filled out a leave request for time to be taken out of her annual sick leave, stating the reason as a job-related injury, and was immediately taken to the hospital for examination.

59. Despite Plaintiff filing proper paperwork, her paycheck indicated she has been charged with a total of 32 hours of leave without pay (LWOP) or absence without official leave (AWOL), which carries a disciplinary action.

60. On April 22, 2005, Mr. Adams informed Plaintiff he was going to make staffing changes that would affect Plaintiff's duties effective June 04, 2005. Since Plaintiff left work on May 31, the sign showing her name has been removed from her office. Further, employees have been informed that their supervisor (i.e. Plaintiff) is out on sick leave. This violates Plaintiff's settlement agreement described above in that it was agreed she would not supervise employees.

61. After being fully appraised of these allegations, defendant declined to take any steps to solve, address, or rectify the problem.

62. In November 2004, Plaintiff applied for a position that was eventually filled by a male employee. The male employee did not have any disability. When Plaintiff asked Leonard Adams why she was not awarded the position, he told Plaintiff she would not be awarded a managerial position without changing her settlement agreement with management prohibiting her from supervising employees.

63. On October 10, 1997, at Plaintiff's year-end performance review, Mr. Adams gave her a rating of "unacceptable" despite him filling out a narrative of her accomplishments and trainings.  This resulted in the loss of approximately $1,500 and a lower salary at present.

64. Plaintiff applied for numerous positions within the United States Postal Service where she met the specified qualifications, but the positions were eventually filled by more able bodied male employees who had not engaged in any protected activity.

65. Plaintiff has a disability (extreme stress and post-traumatic stress disorder) due to a job-related injury that occurred when a subordinate employee, Michael Edwards, threatened her life.

66. Her mental condition substantially impacts her ability to think, interact with other people, and work.

67. Accordingly, Plaintiff required the following accommodations: (1) not to work weekends due to Mr. Edwards' presence and minimal security at the Post Office during weekends; (2) not to have to park in the employee parking lot; (3) not to supervise other employees; and (4) not to have a workstation/office in the general area of Mr. Edwards.  These provisions have been in place for over five years.  The United States Postal Service denied these reasonable accommodations.

68. Plaintiff was required to work weekends at the Post Office.

## Summary of Legal Issues and Argument

69. The issue presented is whether the defendant discriminated against plaintiff based upon when on June 4, 2005 transferred plaintiff and changed her work schedule and conditions.   The plaintiff challenges this single act based upon five theories:

      A.      Reasonable Accommodation

B.    Disability Discrimination

C.    Breach of Settlement

D.    Hostile Environment

E.    Retaliation

F.    Constructive Discharge

## Count I.    Reasonable Accommodation under Rehabilitation Act of 1973

70. Plaintiff re-alleges paragraphs 1-68 above.

71. The issue presented is whether the defendant discriminated against plaintiff based upon disability when in May 2005 the defendant withdrew reasonable accommodations given to her between 2001 and 2005 by transferring plaintiff and changing her work schedule.

72. Plaintiff suffers from post-traumatic stress disorder and anxiety disorder.

73. Her medical conditions constitute a disability, because they substantially limit her ability to concentrate, think, supervise, interact with other people, communicate, and work.

74. Plaintiff also has a record of a disability.   The United States Department of Labor ruled Mrs. West was disabled and could not return to work with a reasonable accommodation.

75. The Department of Labor, plaintiff, and attorney notified the defendant of plaintiff's disability on numerous occasions and provided massive amounts of medical documentation, and at all relevant times defendant has agreed and acknowledged plaintiff has a disability as defined by the Rehabilitation Act.

76. Plaintiff successfully performed all the essential functions of her job for four years prior to the transfer and could have continued to perform all the essential functions so long as she had a reasonable accommodation.

77. As a reasonable accommodation, plaintiff sought and defendant agreed modify plaintiff's job duties and work schedule.   Plaintiff and defendant agreed that Mrs. West would (1) not be assigned supervisory duties, (2) have her own office, (3) not have to work in proximity to Mr. Edwards, (4) not be required to work on weekends, (5) have an assigned handicapped parking place and be able to enter and exit the building from a portal different than the one used by Edwards.   The parties agreed weekend work was particularly dangerous, because low staffing levels might cause Mrs. West to be alone with Edwards and thus co-workers would not be able to rescue her if Edwards attacked. The parties recognized the handicapped parking was needed, because Edwards had been stalking plaintiff and handicapped parking close to the job site would be safer.   The parties acknowledged the accommodations were necessary, because Mrs. West's mental disability renders incapable of dealing with risks to her personal safety.

78. Defendant ceased providing these accommodations on June 4, 2005.   Plaintiff was required to park in the employee parking lot instead of handicapped parking.

79. Plaintiff was required to supervise employees, including the one who threatened her life, Mr. Edwards.

80. Plaintiff was required to work in a cubicle near the employee who previously threatened her life, Mr. Edwards.

81. Plaintiff and counsel have requested on numerous occasions that the defendant and the United States Attorney to restore the previously granted reasonable accommodations. Defendant and United States attorney acknowledged receiving these numerous written and verbal requests, but they have consistently ignored them and have in fact refused to even discuss the possibility of restoring the accommodations.

## Count II.         Disability Discrimination

82. Plaintiff re-alleges paragraphs 1-68 above.

83. Defendant transferred plaintiff, modified her job duties, and changed her schedule, because of a prejudice against persons with disabilities.

84. Defendant did not change the job duties, work schedules, or transfer other similarly situated employees.

## Count III.   Breach of Equal Employment Opportunity Settlement Agreement

85. Plaintiff incorporates allegations made in paragraphs 1-68 above by reference.

86.  Counsel for plaintiff negotiated a settlement with counsel for defendant a settlement agreement. Implementation of the settlement agreement began in 2001.

87. On June 4, 2005, defendant chose to breach the agreement and canceled execution of all of its duties under the agreement.

88. Soon thereafter, plaintiff filed a complaint/administrative charge alleging a breach of the agreement.

89.  Defendant acknowledged timely receipt of the complaint and informed plaintiff in writing that the breach allegations would be investigated within one month.

90.  In fact, defendant had no intention of ever investigation the complaint and 17 months later has still not investigated the breach allegation.

91. Plaintiff exhausted all of her administrative remedies dealing with enforcement of the settlement agreement.

92. After plaintiff informed defendant of breach, defendant continued to breach the agreement and made no effort to cure the breach.

## Count IV.        Hostile Environment

93. Plaintiff re-alleges paragraphs 1-68 above.

94. Defendant created a hostile work environment by permitting its employees to engage in the activities listed above.

95. The United States Department of Labor found as a fact that the Postal Service created a hostile work environment and that plaintiff contracted anxiety disorder and post-traumatic stress disorder as a result of the hostile work environment.    Defendant honored and recurred with this factual and legal adjudication.

96. Defendant learned plaintiff's supervisor and a co-worker had consistently over the period of many years berated, yelled at, and finally threatened to kill plaintiff.    Defendant opted to take no action against any of its staff.    Thereby, defendant gave its employee the green light to attempt to kill plaintiff.

97. In December 2000, an employee of defendant attempted to kill plaintiff by running her car off the road.    Defendant did not regard attempted murder as a sufficiently serious incident to warrant discipline of the employee, and defendant did not even investigate the incident.

98. An employer has a duty to take prompt and effective measures to prevent harassment. Defendant agreed that plaintiff's previous work environment up until 2001 had been hostile.    In 2001, Defendant transferred plaintiff, changed her duties, and altered her work schedule in order to avoid liability for sexual harassment.

99. On June 4, 2005, defendant ceased taking effective measures to prevent sexually hostile work environment.    On June 4, 2005, defendant required to work with an employee currently threatening to kill her.

## Count V.  Retaliation

100.    Plaintiff incorporates the allegations in paragraphs 1-68 above by reference.

101.    The United States Postal Service is retaliating against Plaintiff because she filed an EEO complaint against it.  Plaintiff cites the following examples of adverse action.

102.    On May 18, 2005, Leonard Adams, Manager of Maintenance Operations, informed Plaintiff she was being moved to a position of supervisory capacity, where she would supervise approximately 37 employees.  This is in violation of her previous settlement agreement with management that provides:

    i.    Plaintiff is to keep her current position, days off, and tour as previously promised.  This includes the provision that Plaintiff is not to supervise any employees.

    ii.    Plaintiff's 1997 rating of "unacceptable" is to be changed to "acceptable", and the money Plaintiff would have gotten had she received an "acceptable" rating is to be given her pro-rata.

    iii.    Plaintiff is to retain her former parking arrangement revoked by Mr. Adams in 2003, which allowed her to park away from employee parking and near the gas pump or compound.

    iv.    Plaintiff would be assigned to a Grade 19 job in Labor Relations.

    v.    Plaintiff would be granted attorney fees of $1,500.

    vi.    Plaintiff would be granted compensatory damages of $10,000.

103.    On May 18, 2005, Mr. Adams informed Plaintiff she would have to work Saturdays.

104.    This is a direct violation of her settlement accommodation prohibiting her from working on weekends.  Management directed this to be the case because of the likelihood of Mr. Edwards' presence and the minimal level of security and other personnel in the building on such days.  Mr. Adams disregarded management's directives in retaliation against Plaintiff.

105.    The group Mr. Adams assigned Plaintiff to supervise was previously supervised by Lisa Brown-McNeil.  When Ms. Brown-McNeil was in this position, she was given Saturdays and Sundays off.  Now that Plaintiff occupies this position, Mr. Adams suddenly feels weekend work is necessary for this position and cannot be given as time off.

106.    On May 18, 2005, Mr. Adams changed the type of work Plaintiff is to perform.

107.    Although Plaintiff held the title of Supervisor Maintenance Operations (EAS 17), she was performing administrative work normally handled by employees of higher pay levels.  She was not receiving the requisite pay for such work.  This is a violation of Equal Work, Equal Pay because Plaintiff was paid at a level 17 the entire time she performed these functions.

108.    The duties Plaintiff performed prior to her new assignment are being transferred to higher level employees.  Steve Mummendey (EAS 23) will be responsible for the Maintenance Bidding System.  Anthony D'Souza (EAS 19) will be taking over training/travel.

109.    On May 4, 2005, Plaintiff learned she was being considered for a transfer to Southern Maryland.  Management had previously asked for volunteers to take such a transfer.

110.    However, because this transfer would require either a Tour 1 or Tour 3 shift, both of which mandate working weekends and are the least desirable shifts, no one volunteered. Plaintiff's name was considered because she had an accommodation that prevented her from supervising other employees.

111.    On April 22, 2005, Mr. Adams forbade Plaintiff from attending an employee-sponsored bone-marrow volunteer drive.  Mr. Adams subsequently sent a subordinate employee to ascertain whether Plaintiff was at the drive, and if so, what she was doing there.  This rises to the level of stalking and left the plaintiff in a very nervous state.

112.    In April 2004, Mr. Adams gave facility keys to all the other supervisors except Plaintiff.

113.    In December 2003, Mr. Adams accused Plaintiff of taking a folder from his office that contained information pertaining to Plaintiff's EEO claim.  Plaintiff denied taking file.

114.    Mr. Adams had his supervisor, Lisa Brown-McNeil, call Plaintiff to accuse her of taking the folder from Mr. Adams's office.  Plaintiff denied taking the file.

115.    When Plaintiff reported these events to Louis Higginbotham, Maintenance Manager, he replied it was unlikely Mr. Adams even had a file and told Plaintiff not to worry about it.

116.    In 2000, when Plaintiff was pulling out of the parking lot in her car, Michael Edwards was also pulling out of the employee parking lot in his car.  When Mr. Edwards noticed Plaintiff, he tried to run her off the road by continually jumping into Plaintiff's lane, cutting her off.  Plaintiff finally had to pull off the road and turn onto an unfamiliar road.  Plaintiff complained, and initially management moved Plaintiff to a different

parking arrangement. However, Mr. Adams voiced his negative response to the parking arrangements made for Plaintiff and announced he would have Plaintiff's car towed off the official lot.

117.    On February 5, 1999, Plaintiff was threatened with termination if she did not transfer to a Tour 3 shift position that had Sundays and Mondays off.

118.    In December 1998, Plaintiff was charged 24 hours of AWOL (i.e. leave without pay) while she was on injury leave.

119.    In July 1998, Plaintiff was made to transfer to a detail in the Southern Maryland post office once Michael Edwards was allowed to come back to work. This distressed plaintiff, as she knew Michael Edwards frequented the Bally's fitness gym that was within a mile of the Southern Maryland post office. On one occasion, Ms. West was followed home. She filed a police report documenting the ordeal.

120.    On October 10, 1997, at Plaintiff's year-end performance review, Mr. Adams gave her a rating of "unacceptable" despite filling out a narrative of her accomplishments and trainings. Normally one manager handles all administrative aspects for the supervisors according to tour of duty. However, Steve Mummendey had been appointed to handling Plaintiff's paperwork even though he works the night shift, tour 1 from 11:30 pm to 7:30 a.m. In order to contact him, Plaintiff was forced to come in late at night, leave a message or an envelope at the office. On or about November 30, 2005 Ms. West called and asked for a copy of her work performance evaluation for the year. At that time, Steve Mummendey informed her that she would have to talk to Leonard Adams who would be evaluating her. Only Mr. Adams could provide her with a copy as only he

handles her attendance.  To date, Ms. West has yet to receive a copy of her work performance evaluation.

121.    On May 5, 1997, Plaintiff was subject to an offensive and threatening cartoon that depicted a coffin and contained her name.  This cartoon was left on all the employees' desk.

122.    Plaintiff was required to take PEDC Self Study courses in Basic Electricity to receive an acceptable performance rating.  No other supervisor, except for Samuel Brown, was required to take these courses.  No other female supervisor was required to take these courses.

123.    Sam Brown's performance rating was changed to "acceptable" after he completed PEDC Self Study Courses.  Plaintiff's rating was not changed to "acceptable" after she completed PEDC Self Study Courses.

124.    On April 10, 1997, Mr. Adams informed Plaintiff she would be given a rating of "unacceptable" because she was not supporting management.  Mr. Adams said Plaintiff was not supporting management because she had filed an EEO complaint, had given information to the U.S. Postal Inspection Service, had filed a complaint with the National Association of Postal Services (NAPS), and had written a letter to Congressman Steny Hoyer that detailed her complaints about the Postal Service.

125.    Adams told his supervisor, Jimmy Tihoe, he knew Plaintiff was responsible for encouraging another Postal Service employee, Sandra Beverly, to file an EEO sexual harassment claim against him.  Mr. Adams threatened he would "get that bitch."

126.    On May 27, 2005, Plaintiff presented Mr. Adams with a request for four hours of personal leave on May 31, 2005.  On May 31, when it was time for Plaintiff to leave,

127.     Mr. Adams refused to allow her to do so, forcefully demanding her to meet with a co-worker instead.  Plaintiff tried to negotiate reasonably, but when Mr. Adams continued his demands and became overbearing, Plaintiff's heart began pounding, and she felt excruciating pain shoot down her left arm and hand.  Recognizing this as a symptom of a heart attack, Plaintiff quickly filled out a leave request for time to be taken out of her annual sick leave, stating the reason as a job-related injury, and was immediately taken to the hospital for examination.

128.     Despite Plaintiff filing proper paperwork, her paycheck indicated she has been charged with a total of 32 hours of leave without pay (LWOP) or absence without official leave (AWOL), which carries a disciplinary action.  Steve Mummendey changed 24 hours of the 32 hours of AWOL to sick leave and later he changed the remaining 8 to sick leave.

129.     On April 22, 2005, Mr. Adams informed Plaintiff he was going to make staffing changes that would affect Plaintiff's duties effective June 04, 2005.  Since Plaintiff left work on May 31, the sign showing her name has been removed from her office.  Further, employees have been informed that their supervisor (i.e. Plaintiff) is out on sick leave.  This violates Plaintiff's settlement agreement described above in that it was agreed she would not supervise employees.

130.     After being fully appraised of these allegations, defendant declined to take any steps to solve, address, or rectify the problem.

## Count VI.     Constructive Discharge

131.     Plaintiff re-alleges paragraphs 1-68 above.

23

## Prayer for Relief

Plaintiff Jacqueline West requests that this Court grant him the following relief:

A.    Compensatory damages including but not limited to back pay;

B.    Damages for emotional distress, mental anguish and humiliation, and other

compensatory damages;

C.    Prejudgment and post-judgment interest thereon;

D.    Any promotion and/or step increase he would have acquired but for the

discrimination;

E.    A writ quo warranto;

F.    A writ of mandamus ordering defendant to take affirmative steps to correct

discriminatory practices

G.    Reasonable attorney's fees and costs

H.    Back pay and front pay;

I.    Permanent injunctions preventing further discriminatory acts;

J.    A favorable employment reference; and

K.    A trial by jury

L.    Such other relief as this Court may deem just and proper.


DATED: _____
Plaintiff
By Counsel


_____
Michael J. Beattie, Esquire
D.C. Bar Number 450873
Employee Rights Law Group
9502-B Lee Highway

Fairfax, Virginia  22031
(703) 273-2235 (phone)
(703) 273-3440 (facsimile)

**Certificate of Service**

I certify that a copy of the foregoing Amended Complaint is being sent to the United States

Postal Service on this date _____ ___, 2006 via process server.


_____
Michael J. Beattie